UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNOLD IRRER, ET AL ,

        Plaintiffs,

v.

MILACRON, INC.,

        Defendant.

_____/

Case No. 04-72898

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AS TO PLAINTIFFS GREEN AND GARLAND [70]**

This product liability case comes before the Court on Defendant's motion for summary judgment as to Plaintiffs Green and Garland[1] arguing that their product liability claims against Milacron are time-barred. Defendant's motion is GRANTED. Plaintiffs' tolling and equitable estoppel arguments are rejected.

**I.    Facts**

This Court has diversity jurisdiction over Plaintiffs' product liability action[2] brought by 256 current or former General Motors employees claiming to have been injured by exposure to Defendant Milacron, Inc.'s metalworking fluids used in fabricating metal parts at GM's Buick plant. Plaintiffs' complaint was filed on June 21, 2004.

---

[1]Defendant's motion addressed another Plaintiff, Harriett Betts, but her claims were dismissed with prejudice immediately before the hearing on this matter by a stipulation and order.

[2]Although Plaintiffs assert three theories of recovery (negligence, strict liability and intentional tort), all three arise out of Defendant Milacron's alleged negligence and allege personal injury from Defendant's product.

This matter is currently before the Court on Milacron's motion for summary judgment arguing that Plaintiffs Valerie Green and Regional Garland knew or should have known of their alleged injury and possible cause of action more than three years before this suit was filed. Accordingly, Milacron argues, their claims are time-barred under the applicable statute of limitations.

## II.   Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

2

will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

### A.  General Principles

Under Michigan law, a claim for personal injury from a product must be brought within three years of when the claim first accrues.  Mich. Comp. Laws § 600.5805(13).  The Michigan courts apply a discovery rule to product liability claims, thus affecting the date they accrue for statute of limitations purposes.  *See Moll v. Abbott Labs.,* 506 N.W.2d 816, 823 (Mich. 1993); *Mascarenas v. Union Carbide Corp.*, 492 N.W.2d 512, 514 (Mich. Ct. App. 1992) (observing that "[t]he 'discovery rule' measures the accrual date of latent occupational diseases in products liability cases"); *Stinnett v. Tool Chem. Co.*, 411 N.W.2d 740, 743 (Mich. Ct. App. 1987).

The Michigan Supreme Court adopted "the 'possible cause of action' standard for determining when the discovery rule period begins to run in *Moll.*"  *Solowy v. Oakwood Hosp. Corp.*, 561 N.W.2d 843, 846 (Mich. 1997).  It reasoned that "[t]his standard advances the Court's concern regarding preservation of a plaintiff's claim when the plaintiff is unaware of an injury or its cause, yet . . . also protects the Legislature's concern for finality and encouraging a plaintiff to diligently pursue a cause of action."  *Moll*, 506 N.W.2d at 827.  Thus, "[o]nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action."  *Id.* at 828.  The statute of limitations begins to run at that point, giving the plaintiff three years to investigate and file his complaint.  "Once a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim."  *Solowy*, 561 N.W.2d at 847.

3

Additional general principles apply to Michigan's discovery rule.  It "applies to the discovery of an injury, not to the discovery of a later realized consequence of the injury." *Moll*, 506 N.W.2d at 825.  Moreover, a plaintiff need not know "the details of the evidence by which to establish his cause of action."  *Id.* at 828 (internal quotations and citation omitted).

### B. Application to Undisputed Facts as to Plaintiff Green's and Garland's Causes of Action Against Defendant Milacron, Inc.

Defendant Milacron argues that the undisputed facts presented here show that Plaintiffs Green and Garland each knew or should have known of their injury and  its possible cause for more than three years before this lawsuit was filed because:  (1) each had a documented lung-related condition no later than 1995 and 1996, respectively; and (2) each believed that exposure to metalworking fluids or mists was a possible cause of that condition more than three years before filing this suit.

### 1. Valerie Green

Valerie Green claims that she was exposed to metalworking fluids from 1985 through 1995.  (Def.'s Ex. B, Green Fact Sheet at 2.)  She last worked at GM's Buick Plant on February 10, 1995.  (Green Dep. at 78.)  On that last day of work, Ms. Green had pneumonia.  (Green Dep. at 43.)  She was told by her physician, Dr. Filos, that her pneumonia was triggered by the air in the GM plant where she worked.  (Green Dep. at 44.)  In 1995, she understood that, based on comments from Dr. Filos, that something at work was causing her breathing problems and that it could have been triggered by some

4

unknown chemicals in the work environment.  (Green Dep. at 45-46.)[3]

On February 10, 1995, Ms. Green submitted an application for disability benefits. (Def.'s Ex. D.)  In that application, she identified one of her disabling conditions as asthma, a condition she believed was a work-related condition.  (Green Dep. at 107.)  Her physician, Dr. Musson, submitted a Statement of Disability on April 14, 1995, declaring that Ms. Green was totally disabled and listing shortness of breath, asthmatic type, pneumonia, and obstructive air diseases, among other things, as her present condition.  (Def.'s Ex. E.)

Ms. Green subsequently applied for workers' compensation benefits.  In her June 15, 1995 application, she stated that her employment had caused and significantly aggravated her breathing condition.  (Def.'s Ex. F.)  She also testified that, as of that date, that was her opinion.  (Green Dep. at 105.)  She further testified that, on June 19, 1995, another of her physicians, Dr. Musson, had told her that whatever was in the environment at her work was not good for her lungs.  (Green Dep. at 108.)  On that date, Dr. Musson put Ms. Green on work restrictions that included avoiding smoke, vapors, or fumes because of her lung disease.  (Def.'s Ex. H, 6/19/95 work restriction note.)

In light of the above, Defendant argues that, no later than June 1995, Ms. Green knew that (1) she was injured, and (2) a possible cause was the vapors or fumes in her work environment.  Thus, as of June 19, 1995, Ms. Green had discovered sufficient information about her injury and a possible cause to trigger the three-year statute of limitations on her product liability claims.  This Court agrees with Defendant.

By June 1995, Plaintiff Green knew that:  (1) she had lung problems, (2) she was

---

[3]She was diagnosed with "probable hyperactive airways disease" by Dr. Filos on May 11, 1995.  (Def.'s Ex. K.)

exposed to chemical fumes and mists at the GM plant where she worked (Green Dep. at 49), and (3) her physician had told her exposure to "different elements in the air" at the GM Plant where she worked was causing her breathing problems.  (Green Dep. at 44-46.) Thus, similar to the plaintiff in *Stinnett*, she knew she had a lung problem and believed that "the problem was caused by chemicals [s]he had been exposed to at work" and yet failed to bring this action until nine years later, on June 21, 2004.  *Stinnett*, 411 N.W.2d at 743. *Accord*, *Mascarenas*, 492 N.W.2d at 515 (affirming the trial court's decision that the plaintiff's product liability claim was time-barred because "[p]laintiff himself had associated his neurological symptoms with exposure to toxic fumes as early as 1982 or 1983. . . . [and thus] knew no later than 1983 that he was suffering damages associated with defendants' products.")

### 2.  Regional Garland

Mr. Garland has a long work history at General Motors, most of it marked by respiratory and sinus problems that he attributes to products used at the plant.  These begin in 1966-67 when Mr. Garland was diagnosed with sinusitis and severe chronic sinus headaches and was advised by physicians to avoid contact at work with paint, primer or thinner spray and other paint fumes.  (Garland Dep. at 136-40.)  He also suffered a pneumothorax (collapsed lung) in 1975.  Its cause was not diagnosed, but Mr. Garland told another doctor in March of 1986 that he believed it might have been caused by his workplace exposure to methylene chloride because that product's label stated that it "causes lung damage and can cause death."  (Garland Dep. at 65-66, 115-18; Def.'s Ex. Q, 3/18/96 medical record of Dr. Rotblatt.)

Mr. Garland claims here that he was exposed to metalworking fluids beginning in

6

1984 or 1985 and ending on August 13, 1997, and that this exposure caused chronic sinusitis, reoccurring pneumonia, and in part a collapsed lung. (Def.'s Ex. O, Factual Information Sheet at 4; Garland Dep. at 75-76, 104-112.) Mr. Garland testified that, while working at the GM Plant, he saw "Milacron" on product barrels and saw Milacron representatives wearing Milacron hats. (Garland Dep. at 94-102.)

Mr. Garland also testified that he was exposed to a product called "Chemkleen 338," which he believes to be a Milacron product. There was a specific incident, in either 1984 or 1985, where his exposure to that product took his breath away and left him with a lingering cough. (Garland Dep. at 104-112.) Mr. Garland claims that he was washing cars with other workers and then this chemical product "came in on us, and everybody just lost their breath. And I wanted to know what it was . . . ." (Garland Dep. at 108.) Mr. Garland was very upset and let others at the Plant know about it. He eventually got the label off a barrel of Chemkleen 338 because he believed that was the product being used when "we almost – all of us guys in there, we almost suffocated. They put too much of it into the system that they were washing the cars and stuff with." (Garland Dep. at 107-108.)

In July 1986, Mr. Garland was given a work restriction related to his lungs, calling for no exposure to fumes, vapors, or smoke.[4] (Garland Dep. at 152-54; Def.'s Ex. R, 7/2/86 entry Buick Medical Treatment Record.)

In March 1987, Mr. Garland had a chest x-ray in response to complaints of chest pain and in light of his history of pneumothorax. The report indicates that his lungs were

---

[4]In fact, Mr. Garland testified that virtually the entire time he worked at GM, he was under work restrictions precluding exposure to fumes, vapors and mists. (Garland Dep. at 159.)

7

"negative for active disease" but "emphysematous configuration of the chest noted. Blunting along both lateral costo phrenic sulci most likely related to old pleural fibrosis." (Def.'s Ex. S, 3/30/87 report from B-O-C Flint Medical Department.)

About a decade later, Mr. Garland applied for worker's compensation benefits, listing three injury dates in 1996: February 1, March 13, and October 25, 1996, and claiming that he "has suffered disabling pulmonary injuries as a result of exposure to various chemicals, dusts, fumes and other pollutants in the plant."  (Def.'s Ex. T, Bureau of Workers' Disability Compensation, Application for Mediation or Hearing - Form A.)[5]

Mr. Garland testified that, throughout 1994, 1995, and 1996, he had heard coworkers talk about lawsuits similar to this action, and it was his belief that the metalworking fluids he was exposed to were "dangerous stuff."  (Garland Dep. at 30-35.)

> Q: Have you ever been made aware of other lawsuits involving metal working fluid exposure?
>
> A: I've heard different guys in the shop talk about stuff like that.
>
> Q: What did you hear?
>
> A: That this is some dangerous stuff we're working here.  And it was like what are we working here.  And it was, I don't know, I just go to work.

(Garland Dep. at 30.)

> Q: Well, tell me when you first started to have these conversations with these people.
>
> A: I'd say '94, '95, '96, all the way through there.  Because, see, I left out of the shop in '97.
>
> Q: So sometime between '94 and '97 you would have had these conversations?

_____

[5]Mr. Garland also claimed a March 1993 wrist injury and a 1996 hernia injury.  (Def.'s Ex. T.)

8

A:  Yes.

(Garland Dep. at 35.)

Mr. Garland last worked at the GM Plant on August 13, 1997, when he went out on compensable sick leave.  (Garland Dep. at 47-48, 158.)

Defendant argues that, based on Mr. Garland's own testimony and the dates he claimed he was disabled from lung-related injuries as a result of exposure to chemicals at the GM Plant, Mr. Garland knew or should have known, by October 25, 1996 at the latest, that (1) he was injured, and (2) a possible cause was his exposure to metalworking fluids in his work environment.  Thus, as of October 25, 1996, Mr. Garland had discovered sufficient information about his injury and a possible cause to trigger the three-year statute of limitations on his product liability claims.  This Court agrees with Defendant.

Despite Plaintiffs' claims to the contrary, it is not necessary for Plaintiff to "know of a definitive cause" of his injury; rather, it is "sufficient" that he is "aware of a possible cause" thus triggering his duty to diligently pursue that possible causal connection and file his product liability lawsuit within the three-year statute of limitations.  *Ciborowski v. Pella Window and Door Co.*, No. 257091, 2005 WL 3478159 (Mich. Ct. App. Dec. 20, 2005). Michigan courts strictly adhere "to the general rule that subsequent damages do not give rise to a new cause of action."  *Moll*, 506 N.W.2d at 825 (internal quote and citation omitted).

Michigan's appellate courts have likewise rejected the argument that the statute of limitations on such claims does not begin to run until the plaintiff receives a definitive diagnosis.  *Kullman v. Owens-Corning Fiberglas Corp.*, 943 F.2d 613, 616 (6th Cir. 1991) (citing *Stinnett*, 411 N.W.2d at 742-43).  For example, in *Stinnett*, the trial court denied the

9

defendants' motion for summary judgment on statute of limitation grounds. It held that, for an action to accrue, the plaintiff "has to be informed by a physician that there is a diagnosis of a work-related injury and not something speculative." *Stinnett*, 411 N.W.2d at 472. The Michigan Court of Appeals reversed. It reasoned that, "given plaintiff's own unequivocal deposition testimony, plaintiff knew that he had a lung problem and he believed that the problem was caused by the chemicals he had been exposed to at work." *Id.* at 473 (citing cases). This was enough to trigger the statute of limitations. *Id.*

The same reasoning and result apply here. Mr. Garland knew of his respiratory problems and, like the plaintiff in *Stinnett*, believed, since at least 1984 or 1985, that these problems were caused by the chemicals in the air that he had been exposed to at work. Moreover, by 1996 he believed that the metalworking fluids he was exposed to at work were "dangerous stuff" and he had suffered pulmonary injuries as a result of exposure to chemicals in the GM plant where he worked. This was enough to start the statute of limitations running on his claims. That statute gave him three years to investigate and pursue his product liability claims and to file his lawsuit. He failed to do so, and thus those claims are time-barred.

Accordingly, unless other tolling rules apply, these Plaintiffs' product liability claims against Defendant are time-barred. The Court now addresses Plaintiffs' tolling arguments.

### 4. Plaintiffs' Tolling and Equitable Estoppel Arguments

Plaintiffs argue that tolling is required because (1) class certification issues were pending in a separate Michigan state court action filed in November 1999; (2) Defendant actively and fraudulently concealed the existence of these Plaintiffs' product liability claims

10

and thus the three-year statute of limitations period is tolled for an additional two years under Mich. Comp. Laws § 600.5855; and (3) Defendant Milacron allegedly made false representations to General Motors about the safety of its products and thus the doctrine of equitable estoppel should be invoked to preclude Milacron from arguing the statute of limitations bars Plaintiffs' lawsuit.   The Court considers and rejects each of these arguments.

### a. Pending Michigan State Court Action With Class Allegations

Plaintiffs first argue, without supporting authority, that the statute of limitations on their product liability claims were tolled while class certification issues were pending in a separate Michigan state action, *Gibson v. General Motors Corporation*, *et. al.*, Genesee County Circuit Court, Case No. 99-66596-NO.  Plaintiffs are mistaken.

The three-year statute of limitations period for these Plaintiffs' product liability claims expired before the November 5, 1999 filing date of the putative class action *Gibson* lawsuit in state court:  Ms. Green's expired, at the latest, on June 19, 1998, and Mr. Garland's expired, at the latest, on October 25, 1999.  Moreover, Plaintiffs' tolling argument ignores the fact that, while the *Gibson* action was pending, they filed a separate action against Defendant Milacron.  *Irrer, et al. v. Milacron, Inc. ("Irrer I")*, Genesee County Circuit Court, Case No. 02-75196-NO, was filed in state court on December 10, 2002.  *Irrer I* was subsequently removed to this Court and voluntarily dismissed without prejudice on June 6, 2003.  (*Irrer, et. al. v. Milacron, Inc.*, United States District Court, Eastern District of Michigan, Case No. 02-75092, Docket Nos. 15-16.)  Thus, for about six months, these Plaintiffs had their own separate product liability action pending against Defendant Milacron despite the fact that the *Gibson* action was still pending in state court and that court had

11

not yet denied the *Gibson* plaintiffs' motion for class certification.  Moreover, this action (*Irrer II)* was not filed until June 21, 2004, even though the motion for class certification was denied on April 23, 2004.  Defendant argued at the hearing on this matter that, at the very least, the statute of limitations on Plaintiffs' claims ran during the six months that the separate *Irrer I* lawsuit was pending and for the two months between the *Gibson* court's denial of the plaintiffs' motion for class certification and the filing of the *Irrer II* lawsuit. Defendant's argument is persuasive.

Putative class members like Plaintiffs, who choose to file individual actions before there is a decision on class certification, are not entitled to the benefit of the class action tolling rule.  *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 632-33 (S.D. N.Y. 2004) (citing decisions reaching the same conclusion).   To allow tolling under these circumstances "'would create the very inefficiency'" that the rule announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), was created to prevent.  *Id.* at 633 (quoting *In re WorldCom, Inc. Secs. Litig.*, 294 F. Supp. 2d 431, 450-51 (S.D. N.Y. 2003)). Accordingly, even if the three-year statute of limitations period on Ms. Green's and Mr. Garland's product liability claims had not expired, they would not be entitled to the benefit of the class action tolling rule for the time periods discussed above.

### b.  Fraudulent Concealment

Plaintiffs next argue that under Mich. Comp. Laws § 600.5855,[6] the three-year statute

---

[6]Michigan's tolling statute for fraudulent concealment provides that:

If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim

of limitations on their product liability claims is tolled because Defendant Milacron fraudulently concealed the existence of their cause of action against it.  In support, Plaintiffs proffer:

>   (1) an affidavit from John Truchan, health and safety representative for UAW Local 599 in early 1987,  averring  that during that time period Milacron representatives told the committee members that its metal working fluids were "safe enough to drink" and did not "mention that breathing the mist from metal working fluids could cause any type of breathing problems" (Pls.' Ex. 1, 1/17/05 Aff.);

>   (2) on May 31, 1996, an industry group known as the Independent Lubricant Manufacturers Association ("ILMA") published comments regarding the National Institute for Occupational Safety and Health's ("NIOSHA") February 23, 1996 draft "Criteria for a Recommended Standard:  Occupational Exposures to Metalworking Fluids" expressing its opinion that "NIOSHA has not adequately supported its Recommended Exposure Limit ("REL") for occupational exposures to metal removal fluids – either on a technical or a legal basis" (Pls.' Ex. 2 at 4);

>   (3) deposition testimony showing that  Milacron employee, John Steigerwald, was an officer of ILMA and supported that industry group's positions (Pls.' Resp. at 5);

>   (4) Milacron's Toxicity Advisory Committee minutes from an October 23, 1980 meeting stating the "belief that the area of inhalation toxicology and its far-reaching potentially long-term effects is probably the major area in metalworking fluid occupational health to be concerned about" (Pls.' Ex. 7);

>   (5) an October 17, 1998 internal memo detailing a number of workers "reportedly out on sick leave due to coolant related illness ranging from breathing problems to loss of speech", observing that "all related records from May 98 to date" have been summoned", that "[t]he V8 scare has taken over V6", and there is a "need to take actions to keep it from getting out of hand" (Pls.' Ex. 8);

---

>   from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855.

(6) a November 14, 2000 letter from Milacron to an Environmental Engineer at GM's V6 Flint - Plant #36 enclosing confidential documents concerning the OSHA MSDS for certain Milacron metalworking fluid concentrate (Pls.' Ex. 9);

(7) deposition testimony from Ann Ball, a Milacron technical services representative, that she went out to GM's V6 Plant in response to its concerns about dermatitis and respiratory issues (Ball Dep. at 35-36);

(8) Ball's November 2, 1998 Trip Report revealing that "Many V6 employees have developed a lack of trust surrounding the use of metal removal fluids (MRF's) in the workplace" because "[i]nformation surrounding concerns in the V8 plant have filtered into the V6 plant" and observing that "V6 employees are in need of awareness training so that they have a better understanding of MRF's and their safe use" and further observing, among other things, that "Caution signs found hanging out of reach in various areas through the plant . . . need updating" (Pls.' Ex. 11);

(9) a December 8, 1999 internal Milacron memo discussing a December 2, 1999 request from the GMPTG Flint Components facility "for Milacron to bring in an expert to discuss the possible health affects [sic] of metal working fluids", observing that "in a recent e-mail response from Greg Foltz, Milacron has been advised not to discuss any health and safety issues concerning our products at any GM facility", objecting that the advice is unwise and contrary to prior practice and suggesting that Milacron "conduct the meeting with guidelines" that Milacron not reference the pending lawsuit (presumably the November 1999 Michigan state action) and "will only provide information on the health and safety of metal working fluids that is publicly available" (Pls.' Ex. 12);

(10) deposition testimony from a GM worker, Robert Holt, who worked at Buick, in Plant 10, that at a 2000 meeting plant employees were told that dermatitis complaints were caused by overwashing and not Milacron's coolants and that he was led to believe these Milacron products were perfectly safe (Holt Dep. at 20);

(11) an undated section from an internal Milacron handbook entitled "Questions and Answers: Health & Safety of Metalworking Fluids" with a "Tech Response" for eye, nose, throat and/or bronchial irritation recommending that (in addition to evaluating operating conditions, ventilation, checking out concentration, filling out required forms, eliminating other causes, notifying Regulatory Affairs for a letter, citing OSHA General Duty Clause, not promising to solve the problem, and issuing closure letter) that tech "Listen to complaint – deny ownership of the problem – ventilation or shielding are solutions" (Pls. Ex. 20); and

(12) deposition testimony from another GM employee, Deborah Dantzler-Harris, that she had a conversation in April of 1998 with an unnamed chemical

14

management person about the safety of chemicals used in her department and
was told that "system 7 was safe" and she did not ask him to elaborate
(Dantzler-Harris Dep. at 228-230).

The evidence Plaintiffs proffer does not support application of the tolling statute.

First, Michigan courts make the common sense observation that "only actions <u>after</u>
the alleged injury could have concealed plaintiff's cause of action against defendant
because actions taken before the alleged injury would not have been capable of concealing
causes of action that did not yet exist."   *Doe v. Roman Catholic Archbishop of the
Archdiocese of Detroit*, 692 N.W.2d 398, 404 (Mich. Ct. App. 2004) (emphasis added).
Because Ms. Green and Mr. Garland allege that they suffered work-related lung injuries in
1995 and 1996 respectively, the Court does not consider items 1 and 4 listed above.

Second, Michigan courts have further observed that "[f]raudulent concealment means
employment of artifice, planned to prevent inquiry or escape investigation, and mislead or
hinder acquirement of information disclosing a right of action.  The acts relied on must be
of an affirmative character and fraudulent."   *Id.* at 405 (internal quotes and citations
omitted).  "Thus, the plaintiff must show that the defendant engaged in some arrangement
or contrivance of an affirmative character designed to prevent subsequent discovery."  *Id.*
(internal quotes and citation omitted).

Even when viewed in a light most favorable to Plaintiffs, items 2, 3, 5-12 and Plaintiffs'
proffered evidence on its failure to warn claims cannot be considered affirmative acts by
Milacron designed to prevent these Plaintiffs  from discovering the cause of action they
allege here.  Similar to the plaintiff in *Doe v. Roman Catholic Archbishop of the Archdiocese
of Detroit*, Plaintiffs here fail to distinguish between "plaintiff's knowledge of the evidence
that could prove [his or her] claims and plaintiff's knowledge of the possible causes of

15

action against defendant."  692 N.W.2d at 407.

Finally, much of the evidence Plaintiffs proffer refutes the argument that they could not, with reasonable diligence, have known that they had a possible cause of action thus requiring them to investigate and file their action within three years of that date.  For example, items 5, 7, and 8 acknowledge that by 1998 GM employees from both the V8 and V6 plants had health concerns about working around Milacron's metalworking fluids.  In fact, a lawsuit had been filed in Michigan state court in March 1996 by a group of plaintiff employees at GM's V8 engine plant against General Motors and Cincinnati Milacron alleging respiratory injuries from exposure to metalworking fluids.  *Brock v. General Motors, et. al.*, Genesee County Circuit Court, Case No. 96-46048-NO.  (Def.'s Ex. V.)  Moreover, as Defendant points out, Plaintiffs' complaint alleges that "metal working fluids have been the focus of extensive scientific studies over the past fifteen to twenty years."  (Compl. ¶ 6.)  Defendant also submits evidence that Plaintiffs' union informed its members of the possible health risks associated with working around metalworking fluids since 1984.  (Def.'s Ex. U at M9, M10, M15.)  Thus, despite Plaintiffs' arguments to the contrary, this Court concludes that Plaintiffs are not entitled to the benefit of Michigan's two-year tolling statute for fraudulent concealment.

### c.  Equitable Estoppel

Plaintiffs' final argument is that Defendant Milacron should be estopped from raising the three-year statute of limitations as a bar to this action because it allegedly made false misrepresentations to its customer, General Motors, about the safety of its metalworking products.  (Pls.' Resp. at 11-12.)  This Court rejects Plaintiffs' argument that the facts

16

presented here warrant application of the doctrine of equitable estoppel to preclude Defendant from raising the statute of limitations as a bar to Plaintiffs' action.

"[T]he doctrine of equitable estoppel" is a "judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar." *Cincinnati Ins. Co. v. Citizens Ins. Co.*, 562 N.W.2d 648, 651 (Mich. 1997) (citing *Lothian v. Detroit*, 324 N.W.2d 9 (Mich. 1982)). Michigan courts have been "reluctant to recognize an estoppel in the absence of conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute." *Lothian*, 324 N.W.2d at 18 (internal quotation and citation omitted). The doctrine is generally invoked only when "it can be fairly said that [the defendant] is responsible for deceiving the plaintiff, and inducing [plaintiff] to postpone action upon some reasonably well grounded belief that [plaintiff's] claim will be adjusted if he does not sue." *Id.* (internal quotation and citation omitted). For example, "the usual sort of conduct which may work an estoppel in the statute of limitations context" includes "an offer to compromise or settle plaintiff's claim, a representation that the limitations period was of much greater duration than it actually was, or part payment of plaintiff's claim." *Id.* There is no evidence of this sort of conduct here.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment as to Plaintiffs Green and Garland is GRANTED.

17

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 18, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 18, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

18