UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNOLD IRRER, ET AL ,

        Plaintiffs,

v.

MILACRON, INC.,

        Defendant.

_____/

Case No. 04-72898

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO WARN CLAIMS [93]**

This product liability action comes before the Court on Defendant's motion for partial summary judgment on Plaintiffs' failure to warn claims. Plaintiffs, a group of over 250 present and former employees at General Motors Corporation ("GM")'s Buick Complex in Flint, Michigan, allege that they were injured because Defendant Milacron failed to adequately warn them about health effects caused by exposure to industrial metalworking fluids that Milacron manufactured and distributed to their employer, GM. Under Michigan's 1995 tort reform legislation, a manufacturer or seller of a product cannot be held liable for any alleged failure to warn if the products at issue were provided by it to a sophisticated user. Mich. Comp. Laws §§ 600.2947(4), 600.2945(j). Thus, the core issue presented here is whether Defendant Milacron may take advantage of Michigan's "sophisticated user" statutory provisions and thus avoid liability for Plaintiffs' injuries. For the reasons discussed below, Defendant Milacron's motion is GRANTED.

## I.   Background

This case involves allegations that industrial lubricants called "metalworking fluids" ("MWFs") caused Plaintiffs' varied injuries.[1]  Plaintiffs are current or former GM employees who worked at the Buick plants in Flint, Michigan.  GM manufactured the V6 Engine and certain component parts at the Buick plants, and the majority of Plaintiffs worked at either or both the V6 or Components plants at various times between the 1970s and the present.  Defendant Milacron manufactured and supplied MWFs to some of these GM plants at different times.  Most Plaintiffs claim respiratory injuries such as occupational asthma, chronic bronchitis, and hypersensitivity pneumonitis.  Two Plaintiffs claim to have cancer, and five claim dermatitis and/or skin rashes.

## II.   Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue

---

[1]"Metalworking fluids" is the most common term for these fluids, but they are also referred to as cutting fluids, grinding fluids, coolants, machining fluids, and metal removal fluids.

of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

This matter comes before the Court on Milacron's motion for partial summary judgment arguing that, because it manufactured and sold its MWFs to GM, a sophisticated user as defined under Michigan law, Mich. Comp. Laws § 600.2945(j), Milacron cannot be held liable for any alleged failure to warn pursuant to Mich. Comp. Laws § 600.2947(4). Plaintiffs respond that (1) GM does not fit the statutory definition of a sophisticated user; and (2) because Plaintiffs are not sophisticated users, GM cannot be defined as one under Michigan's statute. Plaintiffs further respond that, even if GM fits the statutory definition of a sophisticated user, Milacron cannot take advantage of Michigan's statute precluding liability for a manufacturer's or seller's failure to warn for products it provides to a sophisticated user because (1) federal and/or state regulations require Milacron to warn about its MWFs; and (2) Michigan's "actual knowledge exception," Mich. Comp. Laws § 600.2949a, applies. Each of these arguments require the Court to determine whether

3

Milacron owed Plaintiffs a duty to warn. The question of whether a duty exists is a question of law for the Court to decide. *See Antcliff v. State Employees Credit Union*, 327 N.W.2d 814, 821 (Mich. 1982).

The Court now considers each of these arguments, beginning with the issue whether GM fits within Michigan's statutory definition of a "sophisticated user."

## A. GM Falls Within Michigan's Statutory Definition of a "Sophisticated User"

In lawsuits filed before the March 28, 1996 effective date of Michigan's tort reform legislation, a manufacturer's duty to warn of material risks related to its products was governed by common law principles. As the Michigan Supreme Court recently observed, Michigan's tort reform legislation "displaced the common law."[2] *Greene v. A.P. Prods., Ltd.*, 717 N.W.2d 855, 859 (Mich. 2006). Accordingly, Plaintiffs' reliance on common law principles applied in *Bock v. General Motors Corporation*, 637 N.W.2d 825, 830-31 (Mich. Ct. App. 2001), is misplaced as that action was filed before the March 28, 1996 effective

---

[2]Michigan's common law observed the following. "[T]he 'sophisticated user' defense is appropriate where the supplier can reasonably rely on the purchaser/employer to warn the ultimate users of the product's dangers." *Newson v. Monsanto Co.*, 869 F. Supp. 1255, 1260 (E.D. Mich. 1994) (citing *Tasca v. GTE Prods. Corp.*, 438 N.W.2d 625, 628 (Mich. Ct. App. 1988)). "That determination, in turn, can be made only after balancing the following considerations: the reliability of the employer as a conduit of necessary information about the product; the magnitude of the risk involved; and the burdens imposed on the supplier by requiring it to directly warn the ultimate users." *Tasca*, 438 N.W.2d at 628. The *Tasca* court, quoting Restatement of Torts (2d), explained the policy reasons for not merely imposing an absolute duty to warn on the manufacturer/seller: "'[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so.'" *Id.* (quoting 2 Restatement of Torts (2d), § 388, comment n., p. 308). *Accord, Mascarenas v. Union Carbide Corp.*, 492 N.W.2d 512, 515-16 (Mich. Ct. App. 1992) (holding that the plaintiff employee's employer was a sophisticated user on whom the defendant chemical manufacturers/suppliers were entitled to rely thus precluding liability on the plaintiff's failure to warn claims).

date of Michigan's tort reform legislation.[3]

Michigan's tort reform statute defines a "sophisticated user" as:

a person or entity that, by virtue of training, experience, a profession, or legal obligations, is or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect. An employee who does not have actual knowledge of the product's potential hazard or adverse effect that caused the injury is not a sophisticated user.

Mich. Comp. Laws § 600.2945(j). Milacron asserts that, because of GM's decades long experience with MWFs and its legal obligations to warn its employees, GM is generally expected to be knowledgeable about the potential hazards or adverse effects of MWFs. Thus, Milacron argues, GM is an entity that fits Michigan's statutory definition of a "sophisticated user." This Court agrees.

### 1. Statutory Definition Distinguishes Between Entities and Employees

Plaintiffs first argue that an entity like GM cannot satisfy Michigan's statutory definition of a "sophisticated user" unless GM's employees had actual knowledge of the potential hazards or adverse effects of Milacron's MWFs that they claim caused their injuries. This argument is defeated by the plain language and structure of § 600.2945(j).

The Court is required to give each word in the statute its plain meaning. *Greene*, 717 N.W.2d at 860. The plain language and structure of § 600.2945(j), by focusing on differing levels of knowledge, provides two distinct definitions for a "sophisticated user." Entities and persons who are not employees are defined in the statute "sophisticated users" if they

---

[3]Unlike the Genesee County Circuit Court in the matter of *Parker, et al. v. Quaker Chemical Corporation*, No. 99-66364-NO, this Court is not constrained (as the Michigan trial court was) to follow *Bock*, a published Michigan Court of Appeals decision. Rather, this Court, following the Michigan Supreme Court's recent pronouncement in *Greene*, 717 N.W.2d at 859, concludes that Michigan's 1995 tort reform legislation displaced its previous common law principles governing the sophisticated user doctrine.

are "generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect." Employees are defined in the statute as "sophisticated users" only if they have "actual knowledge of the product's potential hazard or adverse effect that caused the injury." Neither the language nor the structure of the statute makes one definition dependent upon the other. Milacron does not argue that Plaintiffs are sophisticated users, and their status as GM employees is irrelevant to this Court's determination whether GM is a sophisticated user. It is.

###    2.  GM is Experienced in Using MWFs and is Generally Expected to be Knowledgeable About Their Properties, Including Potential Hazards or Adverse Effects

It is undisputed that GM, by virtue of its decades long experience with MWFs, is generally expected to be knowledgeable about MWFs' properties, including their potential hazards or adverse effects. MWFs are a necessity in the production of automobiles,[4] and GM has used MWFs at its factories since it began making cars. The various plants where Plaintiffs worked were constructed 60-80 years ago, and GM used MWFs at these plants

---

[4]"Metalworking fluids are used in a wide variety of industries as coolants and lubricants for metal machining, grinding, cutting, forming, tooling, and treating in manufacturing operations. Approximately 1.2 million workers (including, among others, machinists, mechanics, and metal workers), who are employed at approximately 185,000 establishments, are exposed to MWFs by means of skin contact or by breathing or otherwise ingesting particles from mists or aerosols." *Int'l Union v. Chao*, 361 F.3d 249, 251 (3d Cir. 2004).

Any industrial operation that uses a grinding, cutting or boring operation to produce metal parts requires the use of MWFs. These processes generate tremendous heat and abrasion, and MWFs cool the tooling surface and provide lubrication on the machining surface. By cooling the process, MWFs protect the cutting tool or grinding wheel, and the lubricating effects protect the finish on the machined part. MWFs also protect tooling machines and machined parts from corrosion, and they remove chips or "swarf" (the accumulation of fine metal and abrasive particles) from the machining zone.

long before Milacron was a GM supplier.  (Def.'s Ex. 1, Ryder Dep. at 30-33.)  Over the years, GM used MWFs from numerous manufacturers, including Quaker, Houghton, Castrol, and D.A. Stuart.  (Def.'s Ex. 2, Smolenski Dep. at 47-48; Def.'s Ex. 3, Truchan Dep. at 110-111.)

GM's factories were designed specifically to use MWFs.  MWFs are provided in a "neat" or concentrated form to GM via tanker trucks or in large "totes."  Once inside the GM factories, MWFs are diluted with water and are used in large "central systems."  A "central system" consists of a large tank or "pit" which stores the diluted MWFs, pumps, filters, and equipment to apply the MWFs to the machines.  There are several separate central systems in a factory.  MWFs are circulated from storage pits out to the monitoring operations through overhead pipes.  MWFs are sprayed onto the tooling surface, then the used fluids and swarf fall into a collection point beneath the machine.  This collection point then goes into trenches under the floor that return the used MWFs (and the swarf and anything else that has fallen into the trench) to the central pits to be used again and again. (Def.'s Ex. 4, Rolf Dep. at 48.)

Before the early 1990s, when GM entered into chemical management contracts, GM managed its own MWF systems with its own employees.  GM trained employees called metallurgists to decide which MWFs to use, how to mix them, when to add biocides, when to test and what to test.  (Def.'s Ex. 1, Ryder Dep. at 30, 32.)  GM employees performed chemical tests in an effort to maintain the fluids.  (*Id.* at 36; Ex. 5, Pauly Dep. at 8-9; Ex. 3, Truchan Dep. at 38-39.)  For nearly a year after Milacron began its chemical management work at the plants, GM employees worked with Milacron employees to teach them how GM managed its MWFs.  (Def.'s Ex. 6, Chevalier Dep. at 40-41; Ex. 7, Jones Dep. at 9.)  Even

7

after Milacron began providing chemical management services, some GM employees continued chemical management type jobs; i.e., metallurgists continued to add concentrate and perform chemical tests on MWFs. (Def.'s Ex. 1, Ryder Dep. at 30-31; Ex. 6, Chevalier Dep. at 15.) GM employees also remained active in the maintenance and control of fluid systems, including identifying the procedures by which they should be cleaned and maintained. (Def.'s Ex. 8, Burgess Dep. at 55-56 and referenced exhibit.) GM employees participated in decisions about what levels of concentrations should be used with MWFs in particular machining systems. (Def.'s Ex. 5, Pauly Dep. at 15-16; Ex. 7, Jones Dep. at 40-41.)

As one of the largest user of MWFs in the world, GM has long investigated the potential health effects of MWFs. In 1982, GM and the United Auto Workers Union ("UAW") established the Occupational Health and Advisory Board ("OHAB"). (Def.'s Ex. 9, Mirer Dep. at 24-25 and referenced exhibit.) The express purpose of the OHAB was to assist the GM and UAW National Joint Committee "on Health and Safety in the evaluation and development of occupational health programs, research projects and related activities." (*Id.*) The OHAB consisted of scientists selected by GM and the UAW, and questions concerning the health and safety of MWFs were the specific reason that led GM to create the OHAB. (*Id.* at 28.)

Under the direction of the OHAB, the GM/UAW National Joint Committee on Health and Safety funded what is now known as the Harvard Study on the health effects of MWFs. The Harvard study included an analysis of almost 50,000 GM workers and an exposure assessment of more than one million jobs at three production facilities. The final study, published in 1992, claims that "these studies represent the most comprehensive

8

environmental health assessment ever conducted on the risks associated with the machining fluids."  (Def.'s Ex. 10 at 301.)

The Harvard researchers, with unprecedented access to GM facilities and worker records, had the unique opportunity to study the potential effects of MWF mists.  GM had the results of this effort long before the results were made public.  The Harvard researchers made periodic reports to the OHAB and GM representatives.  By 1987, the Harvard researchers had reported to GM about potential adverse effects of exposure to MWF mists, including "lung problems, rashes and coughs."  (Def.'s Ex. 12, Dr. Greaves Dep. at 31-32.)  By 1988, the Harvard researchers had presented GM with preliminary results of their research indicating that "acute air flow obstruction is associated with aerosols of various machining fluids, and that airway response occurs well below current recommended exposure limits."  (*Id.* at 32-33.)  The introduction to the Harvard Study states that the researchers "designed the study to determine if workers who have inhaled [MWF] mists or other chemicals over a long period of time have an increased risk of cancer or other disease."  (Def.'s Ex. 10, Harvard Study at 301.)

GM's funding of the Harvard research continued after its 1992 publication.  Numerous follow-up papers have been funded by GM.  Dr. Ellen Eisen, an author of the Harvard Study, states in her May 15, 2006 expert report:

> Data collection [for the Harvard Study] began at three GM plants in 1986 and continued for the next several years.  We published the first cancer mortality results in 1992 and have continued to publish further results up to the present time.  In the mid-1990s I took over responsibility for continuing the ongoing cancer mortality study. . . .
>
> UAW and GM provided additional support for nested case-control studies of larynx and brain cancer [related to MWFs] and for a 10 year update of the cohort study in 1996.

9

(Def.'s Ex. 13, Dr. Eisen Expert Report at 5.)

GM's involvement in exploring the potential health effects of MWFs was not limited to the Harvard Study.  In 1993, the OHAB reported on these GM-funded studies:

. Evaluating the respiratory effects and possible toxic constituents of soluble oil, semi-synthetic and synthetic MWFs;

. Quantifying exposure to MWFs and assessing pulmonary response to both actual and simulated machining fluid exposures;

. Investigating the pulmonary toxicology associated with exposures to synthetic MWFs, soluble oil MWFs, and straight oils;

. Evaluating sensory and pulmonary irritation potential of individual components of MWFs using an *in vivo* bioassay;

. Measuring exposure to MWFs and assessing of respiratory responses in actual and simulated exposure environments; and

. Performing a prospective evaluation of respiratory symptoms and pulmonary function among cohorts of workers exposed and unexposed to MWFs.

(Def.'s Ex. 14.)

In 1988, based on preliminary results from the Harvard Study, the OHAB recommended to GM that it consider implementing an exposure limit of 0.5 mg/m3, or ten times less than the regulatory standard for mineral oil mists.[5]  (Def.'s Ex. 9, Dr. Mirer Dep. at 42-43 and referenced exhibit.)  One year later, the OHAB made the following recommendation to GM about the need to control MWF exposures:

---

[5]There is not and has never been a government regulation establishing a maximum level of exposure to MWF mists.  There is, however, a government standard for maximum exposure levels for mineral oil mists and, as some MWFs contain mineral oils, many manufacturers and MWF producers use the mineral oil exposure regulation as a maximum limit for MWF mist exposures.  The standard for mineral oil mists is and has been five milligrams per cubic meter (5 mg/m3).  *See* 29 C.F.R. § 1910.1000 (table listing standard for "oil mists, mineral" as 5mg/m3).

> With concern for timely and prudent public health action in the context of existing knowledge on possible cancer and respiratory disease risk from machining fluid exposures, the OHAB recommends to the National Joint Committee that General Motors Corporation adopt an exposure limit goal for machining fluid exposures of 0.5 mg/M3.

(*Id.* at 47-49 and referenced exhibit.)  The OHAB continued to study the health effects of machining fluids and to make regular reports to GM.  In 1991, based on draft versions of the Harvard Study (which GM received before publication), the OHAB again recommended that GM reduce exposure to metalworking fluid mists:

> [OHAB] recommends to the National Joint Committee on Health and Safety that the findings provided in the Draft Final Report on Health Effects of Exposure to Machining Fluids be communicated to the affected employees *as preliminary estimates of risks associated with machining fluid exposures.*  Furthermore, OHAB wishes to reemphasize the importance of its recommendation 89-115 on establishing an internal permissible exposure level for machining fluids.

(*Id.* at 51-53 and referenced exhibit.)

GM scientists also actively participated in national symposia that gathered scientists and industry leaders to examine the potential health effects of MWFs.  In 1995, GM research scientist Dr. James D'Arcy helped arrange a national symposium entitled "The Industrial Metalworking Environment – Assessment and Control."  Dr. D'Arcy authored the Symposium Abstract and chaired a session on MWF Epidemiology and Respiratory Effects. (Def.'s Ex. 9, Dr. Mirer Dep. at 111, 113 and referenced exhibit.)  Dr. D'Arcy and another GM employee, Don Smolenski, presented papers on MWFs at the 1997 Symposium. (Def.'s Ex. 9, Dr. Mirer Dep. at 115; Ex. 22.)

GM's expertise in MWF health and safety is underscored by GM's contribution to the leading textbook on MWFs.  The single chapter on MWF health and safety, entitled "Health and Safety Aspects in the Use of Metalworking Fluids," is authored by GM employees P.J.

11

Beattie and B. H. Strohm.  (Def.'s Ex. 23.)

### 3.  GM is Legally Obligated to Warn its Employees and is Expected to be Knowledgeable About MWFs

#### a.  GM/UAW Collective Bargaining Agreements

GM has a legal obligation to be knowledgeable about the MWFs used by its employees at the Flint Buick Complex plants.  GM and the UAW entered into collective bargaining agreements where GM agreed to study the health effects of MWFs and to implement practices to lower employee exposure to MWF mists in the workplace.  GM is contractually obligated to implement medical monitoring for employees who were regularly exposed to MWFs in their work at the Buick plants.

GM's work with the OHAB on health effects is consistent with its obligations under its collective bargaining agreements with the UAW.  Part of the GM/UAW national agreement is the "Memorandum of Understanding - Health and Safety."  (Def.'s Ex. 15 at 536219-536228.)  This MOU specifically recites GM's "obligation to provide a safe and healthful working environment for employees." (*Id.* at 536219.)  The MOU requires GM to "continue to set Occupational Exposure Guidelines to assess employee exposure to chemicals in General Motors' facilities as needed," and it states that such GM-specific guidelines are "necessary whenever existing OSHA Permissible Exposure Limits do not sufficiently protect the worker, or when there is no applicable OSHA Permissible Exposure Limit." (Def.'s Ex. 16 at 538708.)

GM specifically addressed protection from MWF mists in the GM/UAW collective bargaining agreements.  The 1990 agreement expressly addressed the need for decreasing worker exposure to MWF mists and providing medical surveillance to workers

12

exposed to MWFs:

> The Corporation and the Union agree to continue to focus efforts to study the potential health effects of cutting fluids for the purpose of establishing an exposure guideline and, where required, the need for additional controls where cutting fluids are used. . . .

* * *

> Medical surveillance for respiratory effects of machining fluids will be offered to employees who regularly work in operations with machining fluids. Such medical surveillance will include a standardized respiratory symptoms questionnaire and pulmonary function test. For personnel newly assigned to such operations, pre and post shift pulmonary function tests will be done at least once during the first year.

(Def.'s Ex. 9, Dr. Mirer Dep. at 55-59 and referenced exhibit.)

Provisions concerning worker exposure to MWFs were included in every GM/UAW collective bargaining agreement after 1990. In 1996, the bargaining agreement set specific exposure limits for MWF mists in GM factories:

> General Motors will continue to assess employee exposures at operations using metal removal fluids and, *on the basis of the most recent scientific studies*, will comply with an Occupational Exposure Guideline of 1.0mg/M3 or less . . . on existing equipment in our existing facilities. In addition, General Motors will specify that new equipment be engineered and designed to attain a level of 0.5 mg/M3.

(*Id.* at 62-63 and referenced exhibit (emphasis added).) GM's agreement to limit exposures to 0.5 mg/M3 for new equipment predated any proposed government regulation on exposure to MWF mists.[6]

_____

[6]Two years later, in 1998, NIOSH proposed a permissible exposure limit of 0.5mg/m3. (Def.'s Ex. 17 at 5063-67.) This proposed limit has never been adopted. *See Int'l Union v. Chao*, 361 F.3d 249, 252 (3d Cir. 2004) (affirming Secretary of Labor's denial of UAW petition to OSHA to take immediate action regarding MWFs and observing that OSHA's "two main reasons for deciding not to promulgate a rule for MWFs" were (1) "that regulating MWFs was not appropriate because the science regarding MWF exposure neither adequately illuminated an effective way to determine an appropriate permissible

GM, as part of its efforts to reduce worker exposure to MWF mists, conducted mist mapping and aerosol monitoring at the Buick plants.  GM hired an outside contractor to measure levels of MWF mists escaping from its machining operations and to make recommendations for ways to reduce worker exposure.  GM did not share the results of this study with Defendant Milacron.  Milacron first obtained this information during discovery in other MWF litigation.  (Def.'s Ex. 18, June 1996 Report.)

GM had its own industrial hygiene department that conducted mist monitoring, and GM conducted "aerosol mapping" in the Buick plants where it routinely measured mist levels.  (Def.'s Ex. 3, Truchan Dep. at 35, 135-36.)  GM also had industrial hygienists on-site at the V6 and Component plants.  These industrial hygienists developed air sampling plans, investigated air quality complaints, and sampled mist levels within the plants.  (Def.'s Ex. 19, Bolden Dep. at 8; Ex. 20, 3/22/93 memo at GM001537-45.)  They worked under the guidelines of the UAW/GM Industrial Hygiene Technician Program with the goal of sampling the MWF exposure of every worker in each factory.  (Def.'s Ex. 21.)  The relevant portion of the Program from 1991 provides:

> Results of recent joint health studies have shown that exposures to metalworking fluids (MWFs) may present a higher health risk than previously thought.  For this reason, operations where MWFs are being used should be sampled for total particulate to determine the current level of exposure.  In general, sampling strategies should be developed so that each employee's exposure is represented.

(*Id.* at 08086.)  The results of the air sampling tests were reported to the UAW Health and

---

exposure limit, nor supported the conclusion that MWF exposure causes cancer;" and (2) "OSHA identified three agency priorities to regulate 'toxic substances that pose more serious health risks than do MWFs,' and asserted that agency resources could not accommodate the 'enormous resource commitment' that a rulemaking on MWFs would require.").

Safety representative, who was to interpret the significance of the results for the UAW members in the plant.  (*Id.* at 08098.)

### b.  GM's Statutory Obligations

In addition to its obligations under the collective bargaining agreements, GM has a statutory obligation to provide its employees with a reasonably safe environment.  *See* Mich. Comp. Laws § 408.1011(a) (stating that an employer shall "[f]urnish to each employee, employment and a place of employment which is free from recognized hazards that are causing, or are likely to cause, death or serious physical harm to the employee"). *See also Barker Bros. Constr. v. Bureau of Safety & Regulation*, 536 N.W.2d 845, 849 (Mich. Ct. App. 1995) (observing that "[t]he broad sweep of the MIOSHA was intended to afford all persons permitted to work by an employer a reasonably safe work environment"). Federal OSHA regulations also require GM to "provide information to [its] employees about the hazardous chemicals to which they are exposed, by means of a hazard communication program, labels and other forms of warning, material safety data sheets, and information and training."  29 C.F.R. § 1910.1200(b).

GM implemented and maintained a hazard communication program for all of its plants. (Def.'s Ex. 24 at GM001130.)  The foundation of GM's hazard communication program is its Hazardous Materials Control Committee ("HMCC").  (*Id.*)  The HMCC is comprised of both UAW and GM management, and its members may include representatives from engineering, medical, health and safety, production, and research departments.  The HMCC is also authorized to obtain information on chemicals from experts in industrial hygiene, toxicology, and medicine.  (*Id.*)  The HMCC reviews the health and safety attributes of every chemical product used in GM factories and either approves or denies

15

the chemical's use.  (*Id.* at GM001130-31.)

If the HMCC approves the use of a chemical product in GM plants, it then creates a "Safe Use Instruction" specific to that chemical.  (*Id.* at GM001131, 1134-35.)  GM's hazard communication program handbook explains that "Safe Use Instructions tell how to use chemicals safely at GM plants.  SUI's are clear, simple, and easy to read.  The are written by UAW-GM people." (*Id.*)  GM's safe use instruction sheet for the Milacron MWF "Cimcool Five Star 50B" provides, in part, that the effects of inhalation overexposure are "RESPIRATORY IRRITATION, LUNG DAMAGE."  (Def.'s Ex. 3, Truchan Dep. at 107-08 and referenced exhibit.)

GM's hazard communication program also requires that all employees receive training so that they can "use chemicals safely."  (Def.'s Ex. 24 at GM001132.)  GM's training program includes a video devoted entirely to MWFs and lubricants.  (Def.'s Ex., Module Five training video; Ex. 25, Meissner Dep. at 16-17, 40-41.)  This video was created by GM in 1988 and has been used unchanged since that time.  (*Id.*)  It instructs GM employees that MWFs are the largest class of chemical materials used at GM, and that MWFs are a necessary and essential "tool" in industrial manufacturing.  It discusses the four distinct types of MWFs (straight oils, solubles, semi-synthetics and synthetics) and the typical concentrations and ingredients of MWFs.  It addresses the need to maintain MWFs at a chemical balance, the importance of avoiding bacterial contamination of MWFs, and the use of biocides in MWF systems.  It identifies the potential health effects of exposure to MWFs and stresses the importance of minimizing exposure to MWF mists, and suggests mechanisms for reducing exposure to mist, including engineering controls and work practices.  (*Id.*)

16

Having determined that GM falls within Michigan's statutory definition of a "sophisticated user," this Court now examines whether Milacron is entitled to invoke Michigan's statutory "sophisticated user" defense.

### B. Milacron Satisfies the Requirements for Use of Michigan's Sophisticated User Defense

Michigan's 1995 tort reform statute governs the liability of a product manufacturer like Milacron who sells to sophisticated users like GM.   The relevant statutory provision provides that:

> *Except to the extent a state or federal statute or regulation requires a manufacturer to warn*, a manufacturer or seller is not liable in a product liability action for failure to provide an adequate warning if the product is provided for use by a sophisticated user.

Mich. Comp. Laws § 600.2947(4) (emphasis added).

This Court has determined that Milacron provided its MWF products for use by GM, a sophisticated user.  Plaintiffs nonetheless argue that Milacron cannot take advantage of Michigan's statutory defense for manufacturers who sell to sophisticated users because federal regulations, 29 C.F.R. § 1910.1200(a),(c), and (g), require manufacturers to directly warn the employees of a sophisticated user of health hazards created, not by the products in the form they are sold, but rather by they way the sophisticated user employs those products.  This argument fails for a number of reasons.

First, Plaintiffs' argument ignores the plain language of the federal regulations it relies upon.  The federal regulations that set out the hazard communication standard provide that its purpose "is to ensure that the hazards of all chemicals produced. . . are evaluated, and that the information concerning their hazards is transmitted to employers and employees."

29 C.F.R. § 1910.1200(a)(1).[7]  The regulations do not require a chemical manufacturer like

Milacron to directly warn its customer's employees.  Rather, an affirmative duty is imposed

on the customer/employers to directly warn their own employees:

> This section requires . . . *all employers to provide information to their employees about the hazardous chemicals to which they are exposed*, by means of a hazard communication program, labels and other forms of warning, material safety data sheets, and information and training.

29 C.F.R. § 1910.1200(b)(1) (emphasis added).

This is precisely what GM did for its employees.  GM implemented and maintained a

hazard communication program for all of its plants.  (Def.'s Ex. 24 at GM001130.)  The

foundation of GM's hazard communication program is its Hazardous Materials Control

Committee ("HMCC").  (*Id.*)  The HMCC is comprised of both UAW and GM management,

and its members may include representatives from engineering, medical, health and safety,

production, and research departments.  The HMCC reviews the health and safety attributes

of every chemical product used in GM factories and either approves or denies the

chemical's use.  (*Id.* at GM001130-31.)  If the HMCC approves the use of a chemical

product in GM plants, it then creates a "Safe Use Instruction" specific to that chemical.  (*Id.*

at GM001131, 1134-35.)  GM's hazard communication program handbook explains that

"Safe Use Instructions tell how to use chemicals safely at GM plants.  SUI's are clear,

simple, and easy to read.  They are written by UAW-GM people."  (*Id.*)  GM's hazard

communication program also requires that all employees receive training so that they can

---

[7]In 1983, pursuant to the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.*, the Department of Labor "promulgated a hazard communication standard" that is set forth in 29 C.F.R. § 1910.1200.  *Dole v. United Steel Workers of America*, 494 U.S. 26, 28-29 (1990).

18

"use chemicals safely." (Def.'s Ex. 24 at GM001132.) GM's training program includes a video devoted entirely to MWFs and lubricants. (Def.'s Ex., Module Five training video; Ex. 25, Meissner Dep. at 16-17, 40-41.) This video was created by GM in 1988 and has been used unchanged since that time. (*Id.*) It instructs GM employees that MWFs are the largest class of chemical materials used at GM, and that MWFs are a necessary and essential "tool" in industrial manufacturing. It discusses the four distinct types of MWFs (straight oils, solubles, semi-synthetics and synthetics) and the typical concentrations and ingredients of MWFs. It addresses the need to maintain MWFs at a chemical balance, the importance of avoiding bacterial contamination of MWFs, and the use of biocides in MWF systems. It identifies the potential health effects of exposure to MWFs and stresses the importance of minimizing exposure to MWF mists, and suggests mechanisms for reducing exposure to mist, including engineering controls and work practices. (*Id.*)

Second, as to the chemical manufacturer's duty to warn its customers, that duty requires chemical manufacturers to "obtain or develop a material safety data sheet for each hazardous chemical they produce" and requires *employers* who use a hazardous chemical to have a MSDS in the workplace. 29 C.F.R. § 1910.1200(g)(1). Each MSDS is to be in English and must contain information concerning its health hazards, "including signs and symptoms of exposure, and any medical conditions which are generally recognized as being aggravated by exposure to the chemical." § 1910.1200(g)(3)(iv). Chemical manufacturers preparing the MSDS are required to "ensure that the information recorded accurately reflects the scientific evidence used in making the hazard determination." § 1910.1200(g)(5). Moreover, "[i]f the chemical manufacturer" preparing the MSDS "becomes newly aware of any significant information regarding the hazards of a chemical,

19

or ways to protect against the hazards, this new information shall be added" to the MSDS "within three months." *Id.* The regulations do not require chemical manufacturers to provide the MSDS to the ultimate user. Rather, they require the chemical manufacturer to make sure that "distributors and *employers* are provided an appropriate material safety data sheet with their initial shipment, and with the first shipment after a [MSDS] is updated." § 1910.1200(g)(6)(i) (emphasis added). The chemical manufacturer can do this in two ways: "either provide material safety data sheets with the shipped containers or send them to the distributor or *employer* prior to or at the time of shipment." § 1910.1200(g)(6)(ii) (emphasis added). The regulations then require the employer to maintain copies of the MSDS in the workplace and to make sure that they are "readily accessible during each work shift to employees when they are in their work area(s)." § 1910.1200(g)(8).

Plaintiffs do not present the Court with evidence that Milacron's MSDSs provided to their employer (GM) failed to satisfy the requirements of these federal regulations and thus triggered the "except" clause in Michigan's sophisticated user defense statute. Plaintiffs' response does not identify any specific MSDS for any specific Milacron MWF product sold to GM in a specific year that failed to satisfy Milacron's regulatory duty to warn GM under 29 C.F.R. § 1910.1200. Indeed, Plaintiffs' expert, Dr. Daniel Teitelbaum, admitted that he was not qualified to say Milacron's MSDSs were not in compliance.[8]  (Def.'s Ex. 31, Teitelbaum Dep. at 168.)  Rather, Plaintiffs broadly argue that Milacron's MSDSs were

---

[8]As the Sixth Circuit has observed, "it is improper for an expert witness to testify concerning legal requirements, as this 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.'" *In Re Air Crash Disaster*, 86 F.3d 498, 523 (6th Cir. 1996) (quoting *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)).

20

inadequate to warn GM's employees about the health hazards created by GM's use of Milacron's MWFs in its metal machining plants.  This is, in essence, an argument that Milacron's warnings to GM, a sophisticated user, were inadequate.  As such, these claims fit comfortably within Michigan's statutory sophisticated user doctrine.  The "except" clause in Michigan's statutory sophisticated user defense does not apply here.  Milacron has no duty to warn broader than the requirements set forth in the regulations.  Accordingly, Milacron is entitled to rely on Michigan's "sophisticated user" defense to avoid liability on Plaintiffs' product liability claims.

Plaintiffs' reliance on *Muszynski v. Automotive Chemical Corporation*, No. 172735, 1996 WL 33358101 (Mich. Ct. App. Sept. 17, 1996), is misplaced.  In *Muszynski*, the Michigan Court of Appeals rejected arguments similar to those Plaintiffs present here.  It concluded that, because the plaintiffs had "failed to show that [chemical manufacturer] defendants violated their duty to provide employers/purchasers with information regarding the character of their product as required by federal law," the defendants were entitled to rely on the sophisticated user doctrine to avoid liability.  *Id.* at * 7.  The *Muszynski* Court further concluded that the federal regulations at issue here "are consistent with the sophisticated user doctrine in that they place a duty on the employer to warn its employees of the dangers associated with the products that the employees use at work."  *Id.*  Similar to the facts presented here, the defendant chemical manufacturers in *Muszynski* provided the plaintiffs' employer "with information regarding the chemicals and solvents sold to [the employer], and [the employer], in turn, informed its employees, including plaintiff[s], about those dangers."  *Id.*  The same reasoning and result apply here.  Plaintiffs arguments to the contrary are not persuasive.

21

## C.  The "Actual Knowledge/Willful Disregard" Exception Does Not Apply

Finally, Plaintiffs argue that Milacron cannot take advantage of Michigan's statutory "sophisticated user" defense because:  (1) at the time of manufacture or distribution of its MWFs,[9] (2) Milacron had actual knowledge that its warnings were inadequate and thus made its MWFs defective, (3) Milacron had actual knowledge that there was a substantial likelihood that the inadequacies in its warnings would cause the injuries that are the basis of Plaintiffs' action; and (4) Milacron willfully disregarded that knowledge in the manufacture or distribution of its MWFs.  The statutory exception Plaintiffs rely upon is as follows:

> In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product, then section[] . . . 2947(4) . . . do[es] not apply.

Mich. Comp. Laws § 600.2949a.

Milacron argues that there is no genuine issue of material fact that, at the time of manufacture or distribution of its MWFs to GM, Milacron did not willfully disregard actual knowledge that there was a substantial likelihood that its warnings to GM were so

---

[9]As to failure to warn claims, Michigan's tort reform law further provides that the manufacturer's knowledge about the risk of harm based on scientific, technical, or medical information is to be evaluated at the time each allegedly defective product left the manufacturer's control:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a failure to provide adequate warnings or instructions, a manufacturer or seller is not liable unless the plaintiff proves that the manufacturer knew . . . about the risk of harm based on the scientific, technical, or medical information reasonably available <u>at the time the specific unit of the product left the control of the manufacturer.</u>

Mich. Comp. Laws § 600.2948(3) (emphasis added).

22

inadequate as to cause the injuries that are the basis of Plaintiffs' action. This Court agrees. The statutory exception sets a high threshold that Plaintiffs simply do not meet.[10]

Plaintiffs make broad claims and present evidence that they claim support their failure to warn claims. Plaintiffs fail, however, to explain how this evidence shows (1) that Milacron actually knew – based on the scientific, technical, or medical information reasonably available at the time its chemical product left its control as required under Mich. Comp. Laws § 600.2948(3) – that the warning on that chemical product was so inadequate that there was a substantial likelihood that the inadequacies in the warning would cause the injuries Plaintiffs complain about here, and (2) that Milacron willfully disregarded that actual knowledge.

### 1. Plaintiffs' Evidence of Milacron's Actual Knowledge

Specifically, as to Milacron's "actual knowledge," Plaintiffs present evidence that Milacron:

(1) knew about health complaints at GM's Buick plants (Pls.' Ex. 12) and at other sites spanning the years 1980 through 1998, via worker complaints, worker's compensation claims, or lawsuits (PX 37-44, 46, 54, 55-61, 66) and compiled a complaint history for 1989 to 1994 (PX 13);

(2) formed a Cimcool Toxicity Advisory Committee in October 1980 and expressed concerns about potential long-term effects of MWFs (PX 14, 15), performed testing for

---

[10]Plaintiffs' reliance on *Belleville v. Rockford Manufacturing Group, Inc.*, 172 F. Supp.2d 913 (E.D. Mich. 2001), is misplaced. This Court in *Belleville* merely allowed the plaintiff to amend his complaint, pursuant to Fed. R. Civ. P. 15(a), to include a claim that the defendant machine manufacturer willfully disregarded a defect in its product thus triggering Michigan's willful disregard statute, Mich. Comp. Laws § 600.2949a.

studies on MWFs (PX 17-18), including animal testing in the 1980s (PX 19-22, 71-73), was aware of others' testing, including that done by GM/UAW (PX 16, 67-68) and discussed the need for additional studies (PX 17-18);

(3) did not communicate the results of its animal studies to its own employees who were performing chemical management services under a Milacron/GM contract beginning in the early 1990s (PX 23-33);

(4) paid for a "Pittsburgh study" of MWFs that began in September 1990 and ended in November 1991 (PX 45) that (a) "evaluated the sensory and pulmonary irritating properties of 17 machining fluids using an animal bioassay," (b) found that 1 fluid "was devoid of sensory and pulmonary irritating properties over the limited concentration range" generated, another fluid produced "sensory irritation" but no pulmonary irritating properties, and the "remaining 15 fluids were capable of producing both sensory and pulmonary irritation; and (c) cautioned that the study should "be viewed as the first step in evaluating the toxicity of these 17 samples" and suggested additional tests to be considered;

(5) knew in April 1993 that the results from the Pittsburgh showed that "[t]he chemicals causing respiratory irritation have been identified as the emulsifiers in the oil products and the short chain acids used as corrosive inhibitors in synthetics" and that "[t]here is some evidence that AMP may make a fluid less irritating" (PX 46-47);

(6) was aware in August 1993 of criticism of that study's conclusion that its model did not show a chemically assignable cause and insisting that "[t]he statistics are telling us that the 'strongest' drivers of irritation are from the *interaction* of the amines (ethanol amine and triethanol amine) with 'acids' in the metalworking fluids. . . . this means that the amines AND the acids in concert contribute much more to the irritating effect than either would be

24

expected to do separately" (PX 48);

(7) in November 1993 (PX 50) was aware of a 1992 New York University animal study involving used MWFs and concluding that (a) its "experiments demonstrate that aerosols of used machining fluid can produce acute lung injury in the peripheral lung as well as airway obstruction in guinea pigs", (b) "the present results suggest that there is a possibility for acute lung injury and inflammation from exposure to machining fluid aerosols at current TLV", (c) the "experiments, moreover, demonstrate that microbial contamination of machining fluids during usage or storage may contribute to the majority of adverse respiratory effects observed after exposure to aerosols of these fluids"; and (d) "the results of this study suggest that engineering controls which prevent or remove microbial contamination of machining fluids may significantly alleviate the acute respiratory effects of inhaled machining fluids" (PX 49 at 10 (emphasis added));

(8) in 1990, performed a misting, sensory irritation and hard metal disease study that showed results that were within the permissible OSHA exposure limit of 5 mg/m3 but higher than the OSHA recommended exposure limit of 0.5 mg/m3 that was never adopted (PX 51, 52-53);

(9) in 1995, first became aware of an association between hypersensitivity pneumonitis ("HP") and breathing mists from MWFs (PX 70, Milacron Chemist Lucke Dep. at 22-25), but Milacron chemist William Lucke testified that he "wouldn't include the metalworking fluids as a causative factor" [because] "[t]he consensus is that the microbial exposures are the cause of the HP cases." (*Id.* at 94);[11]

---

[11]The inadmissible hearsay in Plaintiffs' Ex. 74, Reh Dep. at 122-24, is properly excluded from consideration on a motion for summary judgment.

25

(10) chemist William Lucke testified that he was "aware of the animal studies that were done at the University of Pittsburgh that found that by and large metalworking fluids at high levels of exposure were pulmonary irritants" (PX 70, Lucke Dep. at 58-59) and the in-house Milacron animal studies but Milacron "really did not have full faith in the animal protocol that was being used" (*Id.* at 60-61);

(11) chemist William Lucke stated, in 1995, that he did not believe more studies were necessary in light of worker complaints about MWFs (PX 64, Lucke Dep. at 465-66);

(12) chemist William Lucke testified that he was available to answer questions about Milacron MWFs and that there was no reason to inform Milacron employees about the proposed OSHA recommendation that OSHA never adopted (PX 65, Lucke Dep. at 213-17);

(13) chemist William Lucke, in a September 18, 1989 memo, informed Ralph Kelly that a review of warning messages on Milacron product labels was ongoing "with the goal of minimizing [Milacron's] potential liability for 'failure to warn'" because a recent case "was predicated on the assumption that [Milacron] product labels were deficient in this area", and suggested guidelines for labels (PX 42, 9/18/89 memo at 1);

(14) in October 1998, in response to the spread of MWF-related fears from GM's V8 plant to its V6 plant, sent Ms. Ball to GM's V-6 plant to investigate worker's health complaints (PX 34-36; PX 35, Ball Dep. at 56-57), and on that visit Ms. Ball explained to the GM workers "that metalworking fluids have the potential from the mist to cause that type of irritation and that that could be the reason for why they were having those things. . . . And the fact that I told them that metalworking fluids have the potential to be respiratory irritants is the information, and that then leads to being in the mist will cause

that" but did not specifically tell the workers than they could get hypersensitivity pneumonia from breathing the mist because she was not aware of "any documentation that we know of that breathing the mist of metalworking fluids is going to   cause hypersensitivity pneumonia, so there would be no reason that I would tell a worker that." (PX 35, Ball Dep. at 60-62);

(15) in 1998, subsequently learned that Ms. Ball had reported to GM that it needed to relocate or update "caution" signs hanging in the GM plants and needed to provide its V6 employees with awareness training so they would have a better understanding of MWFs and their safe use (PX 34-36);

(16) "knew or should have known that . . . workers were experiencing adverse health effects from exposure to metal working fluids in the early 1980s", and "failed to warn workers at the Buick plants performing wet machining" of the adverse health effects from working with MWFs in its MSDSs and though its employees who were on site performing chemical management services under contract with GM (PX 62, Greaves Expert Report at 2-3); and

(17) despite admissions by Plaintiffs' expert, Vernon Rose, that (a) he "cannot to a reasonable degree of scientific certainty identify the specific contaminant or contaminants from the metalworking fluid mist that would cause any of the conditions" that Plaintiffs claim were caused by Milacron's MWFs (PX 63, Rose Dep. at 154-55), (b) that he is "not aware of any test results or articles in peer reviewed scientific journals that identify the components of misting as a part of the use of metalworking fluids in the automotive industry that cause any of the hazardous human health – adverse human health effects" discussed in this suit,  and (c) his "sense" from reviewing various documents, that Milacron had "this

27

belief that it's – that it's not their product that's causing a problem that's associated with the problem in the workplace" (*id.* at 161), Milacron should have provided information about the health hazards associated with MWFs and "the need and usefulness" of "personal protection equipment" when working with MWFs on its MSDSs, its labels, and to its own employees who were performing services at GM's plants under chemical management service contracts (PX 63, Rose Dep. at 155-165).

Despite Plaintiffs' claims to the contrary, this evidence does not show that, at the time any specific product left its control, Milacron had "actual knowledge" that the warning on that chemical product was so inadequate that there was a substantial likelihood that the inadequacies in the warning would cause the injuries that are the basis of Plaintiffs' product liability action.  That Milacron knew about health complaints concerning MWFs that spanned several decades and knew the results of various studies on the health effects of MWFs does nothing to show that it had the sort of "actual knowledge" that precludes it from invoking Michigan's "sophisticated user" defense.  The same is true for Plaintiffs' experts who broadly opine as to what Milacron <u>should have known</u> and what information Milacron <u>should have</u> placed in its warnings but do not opine as to Milacron's actual knowledge as required under § 600.2949a.

Plaintiffs' evidence as to Milacron's alleged willful disregard of this "actual knowledge" is similarly deficient.

### 2.  Plaintiffs' Evidence of "Willful Disregard"

Plaintiffs present the following evidence to show Milacron's "willful disregard" of its "actual knowledge" that any warning on any of its chemical products was so inadequate that there was a substantial likelihood that the inadequacies in that warning would cause

28

the injuries Plaintiffs complain about here.  Specifically, Plaintiffs present evidence that Milacron:

(1) in the 1980s made statements to its own employees about the safety of its MWFs; (PX 78, Borck Dep. at 13-14; PX 80, Truchan Aff.);

(2) in September 1989, was reviewing the warning message on its product labels "with the goal of minimizing potential liability for 'failure to warn' claims" like those in a recent lawsuit (PX 42);

(3) on July 10, 1997, observed that, although "GM initiated a corporate format for MSDS's in 1981-82 which included full disclosure of chemicals used in GM workplaces", those GM forms were not as complete as Milacron's MSDSs, therefore Milacron "must supply our regular MSDS to GM, as well as their form, [and] document that we have supplied the information to them and alert them to refer to our sheet for additional information" (PX 69);

(4) on September 9, 1999, discussed label warnings and received a Milacron employee complaint that the warnings in Milacron's MSDSs were too harsh or explicit (PX 77);

(5) on December 8, 1999, received a complaint from a Milacron employee, Jeff Fox, that Milacron's decision not to go to the GM Flint Components Plant to discuss possible health effects of MWFs "goes against" Milacron's efforts  of "preparing handling, storage, protective equipment, machine cleaning, etc. procedures for metal working fluids, as well as, developing business cases for changing products to Milacron. . . .  Without defending our products we will lose 13 years of hard work and millions of dollars" and suggesting that Milacron accept the offer, provide information on the health and safety of MWFs, but not

29

mention a pending lawsuit by GM workers against Milacron (PX 81); and

(6)  was aware of health complaints in its own plant (PX 75, 61) and, in October 2000,

created guidelines for the "effective management, use and maintenance" of MWFs in its

own plant operations that stated "MWF's are generally safe to work with and around" but

"have the potential to cause problems if not handled or cared for properly" (PX 76).

Plaintiffs' proffered evidence does nothing to show that it willfully disregarded actual

knowledge of a substantial likelihood that alleged inadequacies in its warnings on products

sold to Plaintiffs' employer, GM, caused the health problems that Plaintiffs complain about

here.  Thus, Milacron is entitled to rely on Michigan's statutory sophisticated user defense

to avoid liability on Plaintiffs' failure to warn product liability claims.[12]  Accordingly, Plaintiffs'

failure to warn claims are dismissed.

## IV.  Conclusion

For the above stated reasons, Defendant Milacron's motion for partial summary

judgment on Plaintiffs' failure to warn claims is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 6, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on March 6, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

---

[12]In light of this Court's ruling on Defendant's "sophisticated user" defense, there is
no need to address Defendant's additional arguments for partial summary judgment.